1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,            Case No. 13-cv-05721-WHO

             Plaintiff,
8
                                          **ORDER ON CROSS-MOTIONS FOR**
9          v.                             **SUMMARY JUDGMENT**

10   DALE L. SHIPLEY, et al.,             Re: Dkt. Nos. 304, 307

             Defendants.
11

12          The United States moves for partial summary judgment to foreclose tax liens against the

13   stock of DSGI Technologies, Inc. ("DSGI") held in the name of tax-debtor defendant Dale

14   Shipley.  Dkt. No. 304.  It also moves for summary judgment on cross-claims for quiet title and

15   wrongful levy asserted by a group of Intervenors who claim rights to some of the DSGI stock.

16   The Intervenors oppose the United States' motion and themselves move for summary judgment on

17   their quiet title and wrongful levy claims against the United States, as well as their breach of

18   contract cross-claims against defendant Dale Shipley ("Shipley") and DSGI.

19          The issue central to both motions is whether Shipley effectuated a sale of his restricted

20   DSGI stock to the Intervenors.  I conclude that he did not.  Among other reasons, the transfers did

21   not follow the restrictions imposed on the stock certificates by DSGI and are not reflected  in the

22   books of DSGI.  Accordingly, the United States has the ability to foreclose its tax liens against all

23   DSGI stock in Shipley's name as reflected on DSGI's stock ledger.  I GRANT the United States'

24   motion and DENY the Intervenors' motion.

25                              **BACKGROUND**

26   **I.     PROCEDURAL BACKGROUND**

27          Shipley founded DSGI in 2004 and served as Chairman of the Board until he resigned

28   from the company on June 18, 2013.  DSGI Bus. Plan [Dkt. No. 307-2, Ex. 1] at 1; Dep. of Dale

1    L. Shipley ("Shipley Dep.") [Dkt. No. 307-5, Ex. 2] at 14:17-23.  In July 2004, Shipley was

2    granted and initially owned 266,078.81 shares of DSGI stock.  Shipley 2004 Stock Certificate

3    [Dkt. No. 307-5, Ex. 3, Certificate No. 2, DSGI00122].

4             On December 11, 2013, the United States filed this action to Reduce Federal Tax

5    Assessments to Judgment and Foreclose Liens.  Dkt. No. 1.  The action was filed against Dale and

6    his wife Helen Anne Shipley, and named other entities who the Shipleys owed taxes to[1] and

7    entities who held assets of the Shipleys.  *Id.*  The complaint covers multiple tax liens assessed

8    against the Shipleys, but one lien is primarily at issue in this case—it is dated December 4, 2006,

9    against all of Dale and Helen Anne Shipley's property and property rights.  Decl. of Amanda

10   Dudley ("Dudley Decl.") [Dkt. No. 304-6] ¶ 4.  Notice of that lien was recorded on June 12, 2007,

11   at the Santa Clara County Recorder's Office.  Notice of Federal Tax Lien ("NFTL," Dkt. No. 304-

12   7, Ex. E).

13           On April 4, 2013, the IRS issued a Notice of Levy to DSGI, seeking to collect on the

14   Shipleys' overdue tax liability.  Dudley Decl. ¶ 5.  The IRS served copies of the Levy, as well as

15   copies of the liens "attaching to any property rights or other interests" of the Shipleys, on DSGI on

16   April 9, 2013.  *Id.*  The cover letter noted that the tax lien "attaches to all real and personal

17   property, including Shipley's stock and/or ownership interest in DSGI.  As DSGI monitors any

18   potential stock sale, please ensure that any potential buyer is aware that a Notice of Federal Tax

19   Lien has been filed and attaches to Shipley's interest."  *Id.*  IRS Notice of Levy ("Levy" or

20   "Notice of Levy," Dkt. No. 304-8, Ex. F).  The Notice of Levy itself states that "[t]he levy attaches

21   to any and all payments due to . . . Dale L Shipley . . . .  This includes but is not limited to wages,

22   stock sales/distributions, dividends, etc."  *Id.*  The Notice of Levy also explains that the levy

23   "required you to turn over to us this person's property and rights to property . . . that you have or

24   which you are already obligated to pay to" the Shipleys.  *Id.*  The levy is continuous until the tax

25   liability is released.  *Id.*

26           On April 18, 2014, at the request of the government, I issued an order preventing the

27

28   _____
     [1] California's Franchise Tax Board and the Santa Clara County Tax Collector.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Shipleys from moving, selling, or dissipating any of their assets, real or personal, and appointing a

2    receiver to identify, appraise, account for, marshal, and sell the Shipley's real and personal

3    property in a manner that maximizes recovery and directed the receiver to "complete the

4    liquidation process in a reasonably short time."  Preliminary Injunction Against Shipleys and

5    Order Appointing Robert P. Mosier as Receiver [Dkt. No. 75] 4.  On the same date, I granted the

6    United States' Motion for Partial Summary Judgment, reducing the federal income tax

7    assessments against the Shipleys to judgment.  Dkt. No. 76.[2]

8         Following the entry of that judgment, individuals who purported to own or have rights to

9    DSGI stock through agreements with Shipley moved to intervene in this case (Brian Potter, Ann

10   Potter, Michael Weiland, Sr., and MW Investment Group, LLC, collectively, "Intervenors").  Dkt.

11   No. 78.  The motion was granted (Dkt. No. 90) and the Intervenors filed their answer and the

12   following cross-claims on May 30, 2014: (i) claim for Quiet Title – 28 U.S.C. § 2410(a)(1) –

13   against the United States; (ii) claim for Wrongful Levy – 26 U.S.C. § 7426 – against the United

14   States; (iii) Breach of Contract against Dale Shipley and DSGI; (iv) Fraud against DSGI; and (v)

15   Negligent Misrepresentation against DSGI.  Dkt. No. 95.

16        By agreement of the parties and Intervenors, I stayed proceedings regarding the DSGI

17   stock and any rights the Intervenors had to DSGI stock pursuant to agreements with Shipley. Dkt.

18   No. 208.  In October 2021, the stay was lifted to allow for limited discovery and briefing "to

19   determine the ownership of the DSGI stock held in the receivership to which there is a dispute and

20   the priority of payout if and when there is a stock liquidity event for the DSGI stock."  Dkt. No.

21   297.

22        The United States and the Intervenors then filed cross-motions for summary judgment.

23   Dkt. Nos. 304, 307.  DSGI joins the United States' motion for summary judgment and opposes the

24   Intervenors' motion.  Dkt. No. 305.  The Shipleys join the Intervenors' motion for summary

---

[2] That Order covered the following assessments:  2001 tax year liability (assessed on 6/28/2010,
8/22/2011); 2002 tax year liability (assessed on 7/5/2010, 8/22/2011); tax year liability 2003
(assessed on 11/1/2010); tax year liability 2004 (assessed on 12/4/2006, 8/22/2011); tax year
liability 2005 (assessed on 5/31/10, 8/22/2011); tax year liability 2006 (assessed on 5/16/2011,
8/22/2011); tax year liability 2007 (assed on 11/29/2010); and tax year liability 2008 (assessed on
5/31/2010).  The tax liability assessed totaled $18,310,168.24.  Dkt. No. 76 at 2.

United States District Court
Northern District of California

1  judgment and oppose the United States' motion.  Dkt. No. 312.

2  **II.   FACTUAL BACKGROUND**

3       On July 1, 2004, Shipley and cross-defendant DSGI entered into a Stock Purchase

4  Agreement through which Shipley secured 266,078.81 shares of DSGI stock.  DSGI, Inc. Stock

5  Purchase Agreement ("DSGI SPA") [Dkt. No. 304-1, Ex. 20] at 1.  The agreement includes the

6  following statement:

> (e) <u>Restricted Securities</u>.  The Company has disclosed to Purchaser
> in writing that (i) the sale of the Shares has not been registered under
> the Securities Act of 1933, as amended (the "Act"), and the Shares
> must be held indefinitely unless a transfer of the Shares is
> subsequently registered under the Act or an exemption from such
> registration is available[.]

11  *Id*. at 2.  On the back of the stock certificate that Shipley received in 2004, the following

12  restrictions regarding subsequent sale or distribution of the stock appeared:

> The securities represented by this certificate have been acquired for
> investment and not with a view to or in connection with the sale or
> distribution thereof.  No sale or distribution shall be effected without
> an effective registration statement related thereto or an opinion of
> counsel satisfactory to the corporation that such registration is not
> required under the Securities Act of 1933.

17  Shipley 2004 Stock Certificate. [Dkt. No. 304-1, Ex. 21 Certificate No. 2, DSGI00122].

18       On April 28, 2006, in his capacity as a "private individual" Shipley entered into an

19  "Agreement to Purchase DSGI Common Stock from Dale L. Shipley" with Intervenors Brian and

20  Ann Potter, where the Potters purported to purchase 6,250 shares of DSGI stock from Shipley at

21  $40 per share.  Dkt. No. 95, Ex. A, "Potter SPA" at 1.

22       On July 1, 2006, Intervenor MW Investment Group, LLC ("MWIG") and DSGI entered

23  into a "DSGI Technologies Inc. Subscription Agreement for Common Stock."  Dkt. No. 95, Ex. B.

24  This agreement was between DSGI and MWIG for 2,500 shares of DSGI stock for $100,000.  *Id*.

25  The agreement was "accepted" by and signed by Jeffrey Kowalski ("Kowalski"), the co-founder,

26  President, and CEO of DSGI.  *Id*.  DSGI issued MWIG a stock certificate covering that purchase.

27  Decl. of Jeffrey M. Kowalski in Supp. of DSGI Technologies, Inc.'s Joinder in the United States'

28  MSJ ("Kowalski Decl.") [Dkt. No. 305-2] ¶ 9.

On July 15, 2006, in his capacity as a "private individual," Shipley entered into an "Agreement to Purchase DSGI Common Stock from Dale L. Shipley" with MWIG.  Dkt. No. 95, Ex. C, "MWIG SPA."  The MWIG SPA purported to sell 7,500 of Shipley's DSGI shares to MWIG at $40 per share.  *Id*.

Intervenor Michael Weiland, Sr., Shipley's brother-in-law, claims he also entered into an agreement with Shipley to purchase 1,125 shares of Shipley's DSGI stock at $40 per share on July 15, 2006.  Decl. of Michael Weiland ("Weiland, Sr. Decl.") [Dkt. No. 307-3] ¶¶ 6, 12 & Ex. 1 ("Agreement to Purchase DSGI Common Stock from Dale L. Shipley" as a "private individual," "Weiland SPA").  The Weiland SPA is unsigned and was only produced during briefing on these motions for summary judgment after Weiland, Sr. found it on an old computer that he did not recall using since 2008 or 2009.  Weiland, Sr. Decl., ¶ 12.  Weiland, Sr. asserts that Shipley asked him to purchase the stock directly from Shipley instead of DSGI so that Shipley could gain from the sale.  *Id*. ¶ 5.

On August 10, 2006, Shipley transferred 18,500 shares of his restricted DSGI stock to his wife's Individual Retirement Account ("IRA").  Shipley Dep. [Dkt. No. 304-1] at 27:5-28:5.  On June 1, 2007, Shipley transferred 6,250 shares of his restricted DSGI stock to his attorney, Stephen P. Cohn.  *Id*. at 31:14-32:14.  DSGI issued stock certificates to Mrs. Shipley and Mr. Cohn to reflect the transfers.  *See* DSGI Stock Certificate for Helen Anne Shipley [Dkt. No. 304-1, Ex. 24, Certificate No. 9, DSGI00107]; DSGI Stock Certificate for Stephen Cohn [Dkt. No. 304-1, Ex. 28, Certificate No. 13, DSGI00102].  After these transactions, DSGI issued Shipley a revised stock certificate indicating the reduction in his ownership of DSGI shares to 241,328.81 shares.  Shipley 2007 Stock Certificate [Dkt. No. 304-1, Ex. 29, Certificate No. 12, DSGI00101].

Intervenors assert that Shipley was acting "in his role as Chairman of the Board" when Shipley asked the Intervenors to "invest in DSGI."  Mem. of Points and Auth. in Support of Intervenors' and Cross-Claimants' MSJ ("Intervenors MSJ") [Dkt. No. 307-1] at 4 (Facts Nos. 7, 11, 16).  However, the following facts are undisputed.  In each of the Intervenors' SPAs with Shipley, the purported sale was between them and Shipley "as an individual."  The money Shipley received under the Potter, MWIG, and Weiland SPAs went to Shipley, not to DSGI.  Shipley did

not present the Potter, MWIG, or Weiland SPAs to DSGI.  Shipley did not ask DSGI to issue the Potters, MWIG, or Weiland DSGI stock certificates, and did not surrender his then-current certificate so that DSGI could issue him a new certificate reflecting a decrease in the shares Shipley owned as a purported result of Potter, MWIG, or Weiland SPAs.

The SPAs Shipley executed with the Intervenors were identical to the "DSGI, Inc. Stock Purchase Agreement" Shipley entered into with DSGI in 2004, except that Shipley changed the title, the names of the parties, and the price.  Shipley Dep. at 54:6-17.

Each of the Potter, MWIG, and Weiland SPAs were drafted by Shipley and included the following statements, identical to the statement in Shipley's 2004 DSGI SPA:

> (ii) THE SHARES HAVE NOT BEEN REGISTERED UNDER THE ACT OR UNDER ANY STATE SECURITIES LAWS, ARE BEING ACQUIRED FOR INVESTMENT ONLY, AND CANNOT BE SOLD OR TRANSFERRED UNLESS THEY ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE, AND THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED WITH RESPECT TO THE PROPOSED DISPOSITION AND THAT SUCH DISPOSITION WILL NOT CAUSE THE LOSS OF THE COMPANY'S EXEMPTION FOR THE SALE OF THE SHARES. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENFORSED THE MERITS OF THIS OFFERING.

Potter SPA, at 2; MWIG SPA at 2; Weiland SPA at 2.

Shipley answered "no" to a request for admissions when asked if DSGI approved his sales of shares to the Intervenors.  Def. Shipley's Obj. and Resp. to Intervenor MWIG's Req. for Admis. [Dkt. No. 304-4] 5:7-6:13 (answering "no" to Intervenors' request for admission that DSGI "approved the sale of" Shipley's DSGI shares to the intervenors).

According to DSGI's current stock ledger, Shipley is the holder of 241,328.81 shares of DSGI stock, reflecting the reduction of Shipley's original shares after the transfers to Mrs. Shipley and Cohn were recorded.  Kowalski Decl. ¶ 8.  DSGI never received an opinion of counsel from Shipley regarding his purported sales of restricted shares to Intervenors, and DSGI was never

asked to provide an opinion of counsel related to Shipley's purported transfers or whether the Intervenors were "accredited investors."  Kowalski Rule 30(b)(6) Dep. at 74:1-11.  The purported transfers of Shipley's DSGI stock to the Potters, MWIG, or Weiland are not reflected on DSGI's stock ledger.  DSGI was never asked by the Potters, MWIG, or Weiland to issue DSGI stock certificates to them.

According to Kowalski, DSGI allows transfer of its restricted stock like that held by Shipley for "no consideration," but does not allow "sales" of its issued restricted stock for "resale or gain."  Kowalski Dep. at 37:7-23; Kowalski Decl. ¶¶ 1-2.  Kowalski testified that DSGI was unaware of Shipley's purported sales to the Intervenors until the IRS served DSGI with the tax lien.  Kowalski Dep. at 81:20-83:5.

Intervenors dispute this point and assert that Kowalski was aware of at least the sale between Shipley and MWIG, because Weiland Jr. informed Kowalski about it.  Decl. of Mike Weiland Jr./MWIG in Support of Intervenors' and Cross-Claimants' MSJ ("Weiland Jr./MWIG Decl.") [Dkt. No. 307-4] ¶ 10[3]; *see also id*. ¶ 13.[4]  Intervenors and Shipley contend that

_____

[3] Weiland Jr. declares that on July 1, 2006, he "expressly reminded" Kowalski "that MWIG was also purchasing 7,500 shares of stock from my Uncle Dale, and that I had already paid him the $300,000. I asked about that subscription agreement as well.  Mr. Kowalski did not act surprised. He responded that MWIG's purchase of those 7,500 shares was between MWIG and my Uncle Dale, and he said that I should get a copy of that separate subscription agreement from my uncle. Mr. Kowalski definitely never stated that MWIG was not accredited or approved to purchase the shares from DSGI or my Uncle Dale. He also never gave me any reason to believe that DSGI did not approve of MWIG's purchase of 75,000 shares of my Uncle Dale's DSGI stock." Weiland Jr./MWIG Decl. ¶ 10.

[4] Weiland Jr./MWIG Decl. ¶ 13 ("I know that Mr. Kowalski knew that my uncle had sold millions of dollars of his shares to other investors because he also acknowledged that I was sending them updates about the company.  For example, on October 6, 2008, I sent an email to Mr. Kowalski asking for the 2008 and 2009 revenue/order forecasts . . . .  Mr. Kowalski wrote me back the next day saying that the company was planning its next investor meeting for November 7, 2008, and planned to continue doing bi-annual update meetings.  I replied that, as Mr. Kowalski knew, I felt responsible for informing more than 30 family members and investors who had invested over $1.2 million about the company, and I proposed quarterly meetings instead.  Mr. Kowalski knew that MWIG had only purchased $100,000 of shares directly from DSGI, but he must also have understood that a sizeable portion of the other $1.1 million of investors to whom I was providing information had purchased shares directly from my Uncle Dale, including the $300,000 that MWIG had purchased from him."); *see also id*. Ex. 5, 10/7/2008 Email from Weiland Jr. to Kowalski (noting that Weiland Jr. tried to "keep investors and family (that I can safely say I am responsible for/inform >30 and over $1.2M)" informed and for those "30+ investors that look to me" and who were "told we could expect some sort of info on a quarterly basis" that more information was needed for those "people who have invested tens to hundreds of thousands of

1   Kowalski/DSGI did not object to or try and unwind Shipley's purported transfers when Kowalski

2   allegedly became aware of them in either 2006 or 2008.  Both also point to Shipley's equivocal

3   deposition testimony that Shipley may have told Kowalski about his purported "sales" to third

4   parties and Kowalski may have asked Shipley to try and sell some of Kowalski's stock for him.[5]

5          However, it is undisputed that it was not until after DSGI received the IRS levy that DSGI

6   started to receive inquiries from the Intervenors asking DSGI to issue them share certificates, and

7   DSGI never issued the Intervenors share certificates for their purported purchases of Shipley's

8   restricted shares.  Kowalski Dep. at 81:20-82:18; 126:23-127:2.

9          The Amended and Restated Bylaws of DSGI, adopted on November 10, 2004, state that

10   the Chairman of the Board has "authority to execute in the name of the corporation bonds,

11   contracts, deeds, leases and other written instruments to be executed by the corporation . . . ."

12   [Dkt. No. 307-5, Ex. 9] at 12.  On May 8, 2006, the DSGI Board of Directors adopted a Statement

13   of Unanimous Consent in Lieu of a Special Meeting that purportedly authorized the officers of

14   DSGI to sell "*additional* original issue stock" to individuals who had preexisting business or

15   family relationship with the officers and directors of the company.  Kowalski Dep. [Dkt. No. 307-

16   5, Ex. 1] 49:9-19 (emphasis added); *see also id*. at 53:4-20.

17          Intervenors attended multiple shareholder meetings after their purported purchase of shares

18   from Shipley and, in the case of Weiland Jr., the MWIG purchase from DSGI.  Potter Decl. ¶¶ 9-

19   12; MWIG Decl. ¶¶ 12-13; Weiland, Sr. Decl. ¶¶ 7-9.  Kowalski testified that DSGI did not police

20   attendance at the shareholder meetings and that he knew the Intervenors as family members of

21   Shipley.  Kowalski Dep. at 95:22-96:24.  Kowalski explained that it was common business

22   practice for people to bring family and friends to attend these meetings.  *Id*.

23   _____

24   dollars [and who] feel like they should be appraised more than two times a year.").

25   [5] Intervenors repeatedly assert that when informed of Shipley's sale of his stock to third-parties,
    Kowalski asked Shipley to sell some of his stock for him.  Intervenors MSJ 2, 6.  However, the
26   *only* evidence they point to in support is Shipley's deposition testimony where even Shipley could
    not confirm that, in fact, happened.  *See* Shipley Dep. [Dkt. No. 307-5, Ex. 2] at 53:6-17. (When
27   asked "You remember Mr. Kowalski saying that [he was interested in selling his shares] at some
    time?"  Shipley answered "I believe that Mr. Kowalski asked me to sell some of his shares.  I
28   could be wrong on that.").

United States District Court
Northern District of California

United States District Court
Northern District of California

Kowalski testified that DSGI does not independently verify whether potential shareholders qualify as "accredited investors" able to purchase its restricted shares.  Kowalski Dep. [Dkt. No. 307-5, Ex. 1] 69:14-70:6.[6]  According to Kowalski, DSGI includes checkboxes on the subscription agreement it uses pursuant to the SEC guidelines and allows investors to self-claim if they are accredited investors.  *Id*.  When it issues stock, DSGI makes sure that the investors fill out all the information required by the form but it does not hire a third party to verify the information provided.  *Id*. 70:16-72:3.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.* at 324.  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony

---

[6] *Id*. 69:14-70:6 (When asked "Did anybody on behalf of the company need to approve the potential investors purchase of shares?"  Kowalski answered "No.  So it is part of the – if you reviewed the subscription agreement, basically each person needs to do its own – there is a very detailed portion of the subscription agreement, that you pick very clearly per the SEC guidelines that you are an accredited investor.  And make sure you understand that the terms of an accredited investor is self, basically, claimed.  We do not hire the CIA to go out there and see if they are accredited investor.  Do they have to self-claim.  And there [are] many boxes to check.  If it is a trust, it is five million dollars.  If it is an individual, it's a million dollars . . . .").

1   does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

2   *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

### DISCUSSION

4   The United States moves for partial summary judgment on the Intervenors' claims for

5   wrongful levy and quiet title, contending that the claim for quiet title is subsumed by the claim for

6   wrongful levy and that Intervenors failed to file their wrongful levy claim within the nine-month

7   statute of limitations.  The United States also moves against the wrongful levy claim and, in

8   support of its request to foreclose the liens on Shipley's DSGI stock, for judgment that Shipley's

9   purported sale of stock to the Intervenors was ineffective and that it has priority over the

10  challenged shares and is allowed to foreclose on them.

11  The Intervenors move for summary judgment on their wrongful levy and quiet title claims

12  against the United States, oppose the United States' claim to foreclose on the stock, and, in the

13  alternative, seek summary judgment against Shipley and DSGI for breach of contract.

## I.   INTERVENORS' WRONGFUL LEVY AND QUIET TITLE CLAIMS

15  If taxpayers fail to pay for their assessed tax liability within ten days after a notice is

16  served, the IRS can levy all property or rights to property of the taxpayers, whether tangible or

17  intangible.  I.R.C. §§ 6331(a)-(b).  I.R.C. § 6331(d)(1) provides that "[l]evy may be made upon

18  subsection (a) upon the salary or wages or other property of any person with respect to any unpaid

19  tax only after the Secretary has notified such person in writing of his intention to make such levy."

20  The Treasury Regulations explain that a levy is effective if the IRS "serv[es] a notice of levy on

21  any person in possession of, or obligated with respect to, property or rights to property subject to

22  levy, including receivables, bank accounts, evidences of debt, *securities*, and salaries, wages,

23  commissions, or other compensation."  Tres. Reg. § 301.6331-1(a)(1) (emphasis added).  The

24  Ninth Circuit has held that each type of property listed in that regulation is a form of intangible

25  property.  *United States v. Donahue Indus., Inc.*, 905 F.2d 1325, 1329-30 (9th Cir. 1990).  The

26  Shipley's stock shares, therefore, are intangible property.

### A.   Scope of Levy

28  Intervenors argue that their claims to the DSGI stock fall outside the scope of the Notice of

United States District Court
Northern District of California

1    Levy served on DSGI by the United States, and therefore, the United States' Levy cannot reach

2    the contested shares.  In support, the Intervenors assert the Notice of Levy on its face is limited to

3    "all forms of payments due to Shipley" by DSGI.  Intervenors' Oppo. to the United States' MSJ

4    and DSGI Technologies, Inc.'s Joinder ("Intervenors Oppo.") [Dkt. No. 315] 2-3, 10.  The shares

5    are, as noted above, intangible property and not "payments" due to the Shipleys.  Therefore,

6    according to the Intervenors, the United States has no right to any of the DSGI shares as they all

7    fall outside the scope of the Levy.

8       The Intervenors' restrictive view of the scope of the Notice of Levy is unsupported.  The

9    cover page of the Notice states that the Levy attaches not only to payments due to the Shipleys,

10    but also any property interests they have in DSGI.  IRS Notice of Levy [Dkt. No. 304-8, Ex. F]

11    ("Attached you will find both a levy and a cop[y] of liens attaching to *any property rights or other*

12    *interest* in DSGI Technologies held by Dale and Helen Shipley," "The Notice of Tax Lien attaches

13    to all real and personal property, including the Shipley[s'] stock and/or ownership interest in

14    DSGI.") (emphasis added).  Besides the language on the cover page, the Notice itself explains that

15    the Levy "required you to turn over to us this person's property and rights to property . . .  that you

16    have or which you are already obligated to pay this person." *Id*.

17       Under I.R.C. § 6331(a)(1), a levy covers all property or rights to property of a taxpayer

18    who fails to pay for assessed tax liability.  Reply in Support of United States' MSJ ("United States

19    Reply") [Dkt. No. 316] 7.  Because Shipley's stock shares are "intangible property [] not

20    susceptible of physical seizure, posting, or tagging, levy upon it is effected by serving the

21    appropriate form upon the party holding the property or rights to property." *G. M. Leasing Corp.*

22    *v. United States*, 429 U.S. 338, 350 (1977) (citing Tres. Reg. § 301.6331-1(a)(1)).

23       Therefore, the Notice of Levy covered not only the "payments" due to the Shipleys from

24    DSGI, but also all property or rights to property of the Shipleys held by DSGI, including the stock.

25    A levy is effective when the IRS serves the notice on the party in possession of the stock or rights

26    to the stock.  Tres. Reg. § 301.6331-1(a)(1) (emphasis added).

27      **B.**      **Service of Notice of Levy**

28    Intervenors argue that the IRS Notice of Levy served on DSGI on April 9, 2013 was

United States District Court
Northern District of California

ineffective as to their purported rights in the DSGI stock because the United States did not serve notice on them.  Intervenors Oppo. 9-11.  Intervenors contend that the IRS had their contact information and adequate notice of their purported rights to DSGI stock because Shipley disclosed information regarding the Intervenors' interests in his assets to the United States when he listed some of them in an attachment to the Form 433-A that he filed with the IRS on December 3, 2009.  Shipley Form 433-A [Dkt. No. 12-15] at 6.  In the attachment, under section "DSGI Loans," Shipley listed two Intervenors as "Brian Potter $250,000" and "MWieland Group $350,000."  However, that document, disclosing "DSGI loans" provided no notice to the IRS that the identified Intervenors (along with many others listed) purportedly had interests in Shipley's restricted DSGI stock.

Intervenors also point to an email dated August 13, 2013, between Shipley and Kowalski with attachments that reflected the Intervenors' purported purchases from Shipley.  Dkt. No. 315-1, Ex. 10.  In that email, which post-dated the IRS service of the Notice of Levy on DSGI, Shipley asserted he had sent "a version" of the same attachment to Steve Kemp with the IRS.  *Id.*; *see also* Dep. of Dale L. Shipley ("Shipley Dep.") [Dkt. No. 315-1, Ex. 13] 38:6-17 ("I, obviously, sent [a version of the attachments] to Steve Kemp, yes.").  What was contained in the "version" sent to the IRS at some unknown time, and what information it contained regarding the identity of and contact information for the Intervenors or how it described the Intervenors' alleged interests in DSGI stock or "loans" to Shipley, remains unknown.

The Intervenors finally point out that the United States provided notice of this action, as well as the court-mandated ADR process, to them and other purported third-party purchasers of DSGI stock in August 2014 after it filed this case.  Intervenors Oppo. 10-11.  That the United States provided notice of this action to them demonstrates, according to the Intervenors, that providing notice of the Levy to the Intervenors in April 2013 was neither burdensome nor impracticable.  *Id.*

Intervenors rely on two cases to argue that the IRS should have served Intervenors  with the Notice of Levy to make it effective.  Intervenors Oppo. 9.  Those cases are inapposite.  In *Carter v. United States*, the Sixth Circuit granted the taxpayer's motion for summary judgment

1    that her wrongful levy claim was not time-barred because the taxpayer relied on the misstated

2    statute of limitations date in a letter sent to her by the IRS, that misled the taxpayer to file her

3    claim untimely.  110 F. App'x 591, 596 (6th Cir. 2004).  The reason the Sixth Circuit granted the

4    taxpayer motion for summary judgment was not because the IRS failed to serve a third-party

5    claimant but because the letter from the IRS misled the taxpayer and deprived her the opportunity

6    to litigate her claim.

7         In *Miller v. United States*, the district court recognized that "[d]ue process dictates that

8    notice be reasonably calculated to inform all parties with an interest in the property levied of the

9    pendency of the action."  838 F. Supp. 338, 339 (N.D. Ohio 1993) (citing *Douglas v. United

10   States*, 562 F. Supp. 593, 569).  There the question was whether notice had been provided to

11   parties whose property in a safe deposit box had been adequately notified of the seizure of the safe

12   deposit box and auction of the property.  *Id*.  Here, notice was provided to DSGI, the entity that

13   issued the shares and held the ledger identifying ownership.

14        "It is not clear that caselaw excusing the IRS from any obligation to locate or notify

15   'potentially competing' or 'possible' third-party claimants would apply to a known claimant."  *i3

16   Assembly, LLC v. United States*, 439 F. Supp. 3d 71, 81 (N.D.N.Y. 2020).  That said, many courts

17   that have considered this issue conclude that the United States has no duty to serve notice on all

18   third-party claimants who have an interest in the property.  *See, e.g.*, *De Gregory v. United States*,

19   395 F. Supp. 171, 174 (E.D. Mich. 1975) ("IRS has no duty to notify third party claimants of a

20   levy."); *Am. Honda Motor Co. v. United States*, 363 F. Supp. 988, 991 (S.D.N.Y. 1973) ("IRS has

21   no duty to notify creditors, qua creditors, of a levy."); *Williams v. United States*, 947 F.2d 37, 39

22   (2d Cir. 1991) ("Notice of the levy to all potential competing claimants to the property would be

23   impractical and overly burdensome on the government and, therefore, is not required.").

24        Absent authority from this Circuit in support of Intervenors, I agree with the government

25   that they were not required to provide notice of the Levy on anyone other than DSGI, at least

26   respect to the facts of this case seeking to levy payments due to and property of the Shipleys, in

27

28

United States District Court
Northern District of California

particular their DSGI stock as reflected on DSGI's stock ledger.[7]  Imposing a burden on the IRS to provide notice to all possible claimants is not efficient or appropriate.  *See Williams,* 947 F.2d at 39.  That conclusion is particularly appropriate here, given the dispute over who has priority to the DSGI stock that Shipley purportedly sold to Intervenors and the United States' reasonable reliance on DSGI's official stock ledger.[8]

Intervenors separately argue that the Notice of Levy was ineffective because the United States did not serve the Notice of Levy on Shipley, but only served it on DSGI.  *Id.* 10.  However, Shipley has not challenged the United States' actions in this case based on improper service. Shipley's Oppo. to United States MSJ and Joinder with Intervenors' MSJ ("Shipley Oppo.").  The Intervenors do not have standing to argue about deficient notice on behalf of Shipley, and cite no authority in support.[9]

### C.   Wrongful Levy is Intervenors' Exclusive Claim

Having determined that the Notice of Levy covers Shipley's DSGI stock and that the Intervenors were not separately entitled to notice of that Levy, I consider whether the Intervenors' exclusive claim against the United States is their claim for wrongful levy or whether they can assert both their wrongful levy and their quiet title claims.

The United States argues that the Intervenors' claim for wrongful levy is their exclusive

---

[7] Had the transfer of shares from Shipley to the Intervenors been effectuated – as discussed below – then the DSGI stock ledger would have accurately reflected a reduced amount of shares owned by Shipley and the service of the notice of the Levy would be irrelevant as to the Intervenors.

[8]  The Intervenors' argument that the United States should have provided them notice of the Levy on DSGI stock because the Receiver who was appointed by the Court in June 2015 provided individualized notice to the Intervenors is without merit.  *See* Notice of Claims Process For Contested DSGI Technologies, Inc. Stock [Dkt. No.191-1, Ex. A] 4 ("NOTICE IS HEREBY GIVEN that if you assert interest, claim, title or right in the Contested DSGI Stock, you have sixty (60) days from the date of this notice (the 'Claims Period') to complete and return the attached Statement of Verified Claim for to the Receiver *EVEN IF YOU PREVIOUSLY RESPONDED to a notice dated September 11, 2014 from the United States Department of Justice, Tax Division . . . .*") (emphasis added).  The Receiver had different responsibilities and duties to be able to identify and resolve disputed claims to the Shipley's property brought within the Receivership.

[9] The Intervenors' argument that the Levy was ineffective as to their shares because the United States never sought possession of the share certificates themselves or sold any of the shares fails. *See* Intervenors' Oppo. at 8-10.  As noted for intangible property like the DSGI stock, proper notice of the Levy on the "holder" is all that is required.

14

claim because quiet title is subsumed by the wrongful levy claim.  In *EC Term of Years Tr. v. United States*, 550 U.S. 429 (2007), the Trust established a bank account to pay a tax liability owned by other persons, and then filed a tax refund suit based on wrongful levy under I.R.C. § 7426 as well as a claim to recover erroneously collected taxes under 28 U.S.C. § 1346(a)(1).  *Id.* at 432-33.  In a unanimous opinion, the Supreme Court held that if a wrongful levy claim under I.R.C. §7426 is available, it is the exclusive remedy for third parties challenging a government levy.  *See also id.* at 433-34.[10]

In addition, in *Fid. & Deposit Co. of Maryland v. City of Adelanto*, the plaintiff (a third-party nontaxpayer) brought claims against the IRS under I.R.C. § 7426 for wrongful levy and 28 U.S.C. § 2410 for quiet title.  87 F.3d. 334 (9th Cir. 1996).  The Ninth Circuit held that wrongful levy is a third-party nontaxpayer's exclusive claim because allowing the party to assert a quiet title claim (with a six-year statute of limitations) when a wrongful levy claim was available (with a shorter statute of limitations) would defeat Congress's intent to provide a short time limit within which parties should resolve the government's right to levy property.  *Id.* at 337.

Here, as discussed above, the Intervenors' challenges to the scope and service of the Notice of Levy fail.  The Intervenors must bring their claim against the United States as one of wrongful levy.

### D.     Statute of Limitations

The United States argues Intervenors' wrongful levy claim fails because the Intervenors failed to file their cross-claim within the required nine-month statute of limitations.  United States MSJ [Dkt. No. 304] at 9:2-4.  I.R.C. § 7426 provides:

> If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.  Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

---

[10] The Court distinguished *United States v. Williams*, 514 U.S. 527 (1995), where the Supreme allowed a third-party to pursue a claim under 28 U.S.C. §1346(a)(1) because the third-party challenged a lien, not a levy, and therefore I.R.C. § 7426 was unavailable to the plaintiff.

United States District Court
Northern District of California

I.R.C. § 7426(a)(1).  As of May 30, 2014, when the Intervenors filed their answer and cross-claims in this action, I.R.C. § 6532 provided: "[e]xcept as provided by paragraph (2), no suit or proceeding under section 7426 shall be begun after the expiration of 9 months from the date of the levy or agreement giving rise to such action."  I.R.C. § 6532(c)(1).  Treasury Regulations § 301.6532-3(c), referring to I.R.C. § 6502(b), explains that the "date of levy" is the date when "the notice of seizure provided in I.R.C. § 6335(a) is given."  In I.R.C. § 6335(a), "notice in writing shall be given by the Secretary to the owner of the property . . . or shall be left at his usual place of abode or business . . . ."

The effective date of the Levy is April 9, 2013, when the IRS served the Notice on DSGI, where Shipley was then the Chairman of the Board.  Nine months from the effective date of Levy ran in January 2014, but Intervenors did not file their answer and cross-claims until May 30, 2014.  Intervenors do not dispute that the statute of limitations is nine months.  Instead, they argue their wrongful levy claim is not time-barred for two reasons.  First, the Intervenors argue the United States waived the statute of limitations defense: (a) when it failed to list it as an affirmative defense or allege sufficient facts in support to satisfy the *Towmbly/Iqbal* standard in its answer to the cross-claims; (b) when the United States stipulated to the Intervenors' joinder in this action; and (c) when the United States agreed to the notice and claim process in the Receivership. Second, the Intervenors argue that the nine-month statute of limitations should be equitably tolled.  Intervenors Oppo. 12-13.

### 1.    Waiver, Pleading, and Stipulation

Intervenors contend that the United States failed to adequately plead its statute of limitations affirmative defense in its answer to the Intervenors' cross-claims.  *Id.* at 12.  A party must state any affirmative defense in an answer and must satisfies the "fair notice" standard by describing the defense in "general terms."  *Kohler v. Flava Enterprises, Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015); Fed. R. Civ. P. 8(c).  Here, the United States sufficiently pleaded its affirmative defense.  United States' Answer [Dkt. No. 131] ¶ 120 ("The United States denies that the Intervenors are entitled to the relief for wrongful levy sought in this paragraph and avers that the

16

1  Court lacks jurisdiction to award such relief under 26 U.S.C. § 7426 because the period of

2  limitations for bringing a wrongful levy action expired before the Cross-Claims were filed.")

3  While the Intervenors criticize the United States for failing to allege facts in support of the statute

4  of limitations defense – for example, disclosing when the United States contends the statute ran –

5  the United States' answer gives Intervenors adequate notice of its defense.  Nothing further is

6  required.

7       Next, the Intervenors argue that the United States waived the statute of limitations defense

8  when the United States stipulated to the Intervenors' joinder in this action.  Intervenors' Oppo. 13.

9  However, the stipulation signed by the United States provided "[b]y signing this stipulation

10  agreeing that Intervenors may intervene in this action, the Present Parties do not waive any right,

11  claim or defense, and they make no admission regarding the substance of the Intervenors' defenses

12  or claims for relief.  This stipulation is solely for the purpose of allowing Intervenors' defenses

13  and claims to be resolved by the Court without the need for filing a motion to intervene."  Motion

14  to Intervene [Dkt. No. 78, 78-1 at Ex. E].  There is no ground to argue waiver as against the

15  United States based on the stipulation to the Intervenors joining this action.

16       The Intervenors then argue that the United States' agreement with the Receiver's setting up

17  a "notice and claims" process to allow the Receivership to determine potential distributions to

18  creditors acts as an admission of the merits of the Intervenors' claims.  *Id*.  That the United States

19  agreed to the Receiver's "notice and claims" process does not preclude its ability to argue that a

20  particular claim is time-barred or otherwise without merit.  Intervenors points to nothing in the

21  language of the Order Granting Motion to Amend the Appointing Order and Approve the

22  Receiver's Proposed Notice and Claims Process [Dkt. No. 191], that would preclude the United

23  States' statute of limitations defense or otherwise provide any authority for this argument.

24       The United States put the Intervenors on sufficient notice of this defense by raising it in its

25  answer to the Intervenors' cross-claims, and neither the stipulation to intervention nor the

26  agreement to the Receiver's use of a notice and claim process was a waiver of that defense.

27       **2.    Equitable Tolling**

28  Intervenors more substantively argue that the statute of limitations should be equitably

United States District Court
Northern District of California

17

tolled.  Intervenors' Oppo. 14-17.  The Ninth Circuit held in *Volpicelli v. United States* that the

statute of limitations under I.R.C. § 6532(c) is not jurisdictional and is subject to equitable tolling.

777 F.3d 1042, 1047 (9th Cir. 2015) ("We reaffirm our prior holding that the limitations period set

by I.R.C. § 6532(c) is not jurisdictional and may be equitably tolled." (citation omitted)).

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1)

that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood

in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418, (2005) (citation omitted).  For the first

element, the court must evaluate "the petitioner's diligence both before and after the existence of

the 'extraordinary circumstance,'" requiring "petitioner to show his diligence continued up

through the point of filing his . . . petition in federal court."  *Smith v. Davis*, 953 F.3d 582, 593 &

n.3 (9th Cir. 2020).  The second element requires a fact-specific inquiry.  *Id*. at 590-91.

Intervenors claim that an extraordinary circumstance stood in their way because the United

States could have provided them notice when they served the Levy on DSGI, but instead the

Intervenors only learned of the Levy at the February 2014 DSGI shareholder meeting, one month

after the expiration of the nine-month statute of limitations.  Intervenors' Oppo. 16-17.

Intervenors also argue they pursued their rights diligently "from the moment they learned of the

purported levy on DSGI," by immediately sending a letter to the United States about their claims

on the stock and filing their Motion to Intervene shortly after they received notice.  *Id*. at 16.

The United States responds that the Intervenors were not diligent because the diligence

evaluation considers not only the Intervenors' conduct *after* they learned of the levy, but also their

conduct *before* the Notice of Levy was served, meaning what steps they took to effectuate their

interests in the stock shares.  United States Reply 5.  The government contends the Intervenors did

not pursue their rights diligently because at the time they entered the SPAs with Shipley they

failed to ask Shipley to transfer the shares to them (asking for their stock certificates or other proof

of ownership) or contact DSGI themselves to ask that their shares be reflected on DSGI's stock

ledger and that DSGI issue stock certificates to them.  Given *that* lack of diligence, the United

States argues the statute of limitations should not be equitably tolled.  *Id*.  The United States also

argues that had the Intervenors immediately filed an administrative claim for wrongful levy, their

1    statute of limitations would have been extended an additional 12 months.  United States Reply at

2    3-4, 6.

3        I agree with the United States that the Intervenors have not shown a truly extraordinary

4    circumstance or that they acted diligently to protect their purported interest in the DSGI stock

5    before they learned of the Notice of Levy.  The statute of limitations bars their claims.

6    Nonetheless, I will also analyze their wrongful levy claim on the merits and consider their

7    arguments in opposition to the United States' motion to foreclose on its liens.  As explained

8    below, because the purported transfer of shares between Shipley and the Intervenors was

9    ineffective and not reflected in the books or actions of DSGI, the shares remain property of the

10   Shipleys subject to the United States liens and Levy.

## II.    INEFFECTIVE TRANSFER OF SHARES

12       State law determines a taxpayer's interest in property, and federal law determines to what

13   extent tax lien can attach to the interest.  *Drye v. United States*, 528 U.S. 49 (1999) ("We look

14   initially to state law to determine what rights the taxpayer has in the property the Government

15   seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights

16   qualify as 'property' or 'rights to property' within the compass of the federal tax lien

17   legislation.").  Intervenors assert they have ownership of the stock even though DSGI never issued

18   them stock certificates or otherwise reflected their ownership interests in the DSGI stock ledger

19   and Intervenors admit their failure to comply with the restrictions present in both the DSGI SPA

20   (under which Shipley received his stock) that were repeated in the Intervenors' SPAs and included

21   on Shipley's DSGI stock certificates.  Intervenors contend that the presentment of the stock to and

22   issuance of certificates by DSGI were mere ministerial acts that cannot defeat their ownership

23   interests.  They assert that the restrictions on the transfer or sale of the stock were either not

24   effective as to them or were satisfied or waived by Shipley and DSGI.  They also argue that

25   despite the restrictions and their failure to secure stock certificates in their name, they have

26   sufficient ownership in the stocks as of the date they entered the SPAs with Shipley under three

27   theories: beneficial interest, equitable assignment, and chose in action.  Intervenors' MSJ 10-13.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.     DSGI Stock Restrictions

The consistent underpinning of Intervenors' arguments is that the restrictions on the transfer of Shipley's shares – namely the need to get an opinion of counsel or otherwise satisfy DSGI that purchasers are "qualified investors" and then to have DSGI issue new stock certificates and adjust its ledger to reflect the changed ownership – were simply ministerial steps that really did not matter.  However, the very issue presented here – who owns the DSGI stock – demonstrates why closely held corporations have an interest in keeping accurate stock ledgers and otherwise complying with SEC regulations regarding sales to qualified investors.[11]

### 1.     Enforceability of Restrictions

Intervenors argue that the failure of Shipley or the Intervenors to satisfy the restrictions on stock transfers included in the SPAs and reiterated on the back of Shipley's stock certificates cannot preclude their ownership claim because the restrictions did not comply with statutory requirements and Intervenors did not have sufficient knowledge of those restrictions.

California's Commercial Code § 8204 provides that "[a] restriction on transfer of a security . . . is ineffective against *a person without knowledge* of the restriction unless either of the following applies: (1) The security is certificated and the restriction is noted conspicuously on the security certificate.  (2) The security is uncertificated and the registered owner has been notified of the restriction."  (emphasis added).  In addition, California Corporations Code § 418(b) provides that "[u]nless stated on the certificate . . . no restriction upon transfer . . . shall be enforceable against a transferee of the shares *without actual knowledge* of such restriction."  (emphasis added).

---

[11] In its joinder in the United States' motion and in opposition to the Intervenors' motion, Dkt. Nos. 305, 314, DSGI explains the importance of a privately held company placing restrictions on the sale or transfer of shares as necessary to maintain the company's exemption for registration with Securities and Exchange Commission.  Dkt. Nos. 305 at 3-4; 314 at 8-9.  Intervenors provide no authority that compliance with these restrictions, that allow DSGI to control transfers of its stock consistent with the SEC requirements and for DSGI to track its stock, are merely "ministerial" and should be ignored.  Intervenors rely on *White v. Demaray*, No. C-13-05169 EDL, 2014 WL 343143, at *5 (N.D. Cal. Jan. 28, 2014), which does not help them.  While recognizing some steps by a company selling its own stock might be considered ministerial, the court found that the plaintiff lacked standing to pursue a derivative suit where "the stock that was purportedly issued to Plaintiff never existed because the amendment to the Minutes that included the issuance of the stock was never recorded with the Secretary of State, and there was no other contract for the transfer of specific stock. Therefore, there was no contract between the parties . . . ."

United States District Court
Northern District of California

Finally, California Commercial Code § 174 explains that "on the certificate" means the statement must appear on the face of the certificate *or* on the back as long as there is a reference to the restrictions on the face.  Cal. Com. Code § 174.  Intervenors argue that the DSGI stock transfer restrictions are ineffective because the restrictions were not included on the face of Shipley's stock certificates, and while the restrictions were present on the back of those certificates, there was no notation on the front altering readers to the back in violation of the California code.  Intervenors' Oppo. 17-18; Shipley 2004 Stock Certificate.

However, these code provisions seek to protect investors who *have no actual knowledge of the restrictions*.  Each of the SPAs that the Intervenors signed disclosed that these shares were restricted, unregistered shares.  Each SPA disclosed (consistent with the DSGI SPA):

> (ii) THE SHARES HAVE NOT BEEN REGISTERED UNDER THE ACT OR UNDER ANY STATE SECURITIES LAWS, ARE BEING ACQUIRED FOR INVESTMENT ONLY, AND CANNOT BE SOLD OR TRANSFERRED UNLESS THEY ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE, AND THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED WITH RESPECT TO THE PROPOSED DISPOSITION AND THAT SUCH DISPOSITION WILL NOT CAUSE THE LOSS OF THE COMPANY'S EXEMPTION FOR THE SALE OF THE SHARES. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENFORSED THE MERITS OF THIS OFFERING.

Potter SPA, at 2; MWIG SPA at 2; Weiland SPA at 2.  The restrictions are not unenforceable under the Commercial Code because the Intervenors *had knowledge* that the shares they purported to purchase from Shipley were restricted and of the restrictions that DSGI adopted for sale and transfer of its stock, pursuant to requirements imposed by the SEC.[12]  Intervenors contend that, at

---

[12] The Intervenors appear to argue the restrictions cannot be effective as against Shipley and/or themselves because it is undisputed the front of the DSGI certificates did not contain the restrictions or indicate the restrictions were on the back of the certificates.  Intervenors' MSJ at 16.  It is undisputed that Shipley had actual knowledge of the restrictions, as he included the restriction language from the DSGI SPA in each of the Intervenors' SPAs, and as demonstrated when he complied with those restrictions in connection with his transfer of shares to his wife's IRA and to Cohn.

most, this language in their SPAs indicated the shares they were purchasing were unregistered and they were restricted from further transferring them without complying with the restrictions, but the language did not indicate the restrictions applied to their initial receipt of the DSGI shares. Intervenors' Oppo. 18.  But Intervenors do not dispute that they knew that they were purchasing *existing* shares of DSGI from Shipley as an individual, not newly issued shares from DSGI. Weiland Sr. Decl. ¶ 5 ("[Shipley] asked that I purchase my shares directly from him so that he would make the money from the sale.  He prepared and sent me a subscription agreement that he told me was essentially the same form that he was using with . . . [those] who were purchasing shares directly from DSGI.").  The restrictions on the unregistered shares manifestly applied to both transactions of the same shares.

### 2.     Standing of United States

Second, Intervenors contend that the United States cannot assert that the Intervenors' interests in the DSGI shares are invalid because it is not a party to the SPAs they entered into with Shipley.  Intervenors' MSJ 14.  But the Internal Revenue Code empowers the IRS to levy all property or rights to property on taxpayers who refuse or fail to pay for their tax liability.  I.R.C. § 6331(a).  The IRS is allowed to defend against the wrongful levy claim brought by the Intervenors and assert their right to priority to (and ability to foreclose on) DSGI shares owned by Shipley as reflected in DSGI's ledger even though the United States is not a party to the contract signed by Intervenors and Shipley.

Determination of whether Shipley effectuated the transfer of some of his shares to the Intervenors, as all parties agree, is critical to determining whether the Intervenors are bona fide or otherwise protected purchasers whose interest in the shares takes priority over the United States' interests.  Satisfaction of the restrictions was necessary to effectuate the transfer of Shipley's shares to the Intervenors.

### 3.     Waiver

Third, Intervenors argue that when Shipley purported to sell his DSGI shares to the Intervenors, he was acting as an agent of DSGI and was empowered to waive the stock restrictions on behalf of DSGI when doing so.  Shipley's agency on behalf of DSGI – as its founder and

22

Chairman of the Board – likewise made it reasonable for the Intervenors to "assume" that Shipley would effectuate the sales.  Intervenors' Oppo. 22.  This argument might have more force if Shipley was selling new or additional DSGI shares or otherwise acting to raise money for the company, but it was undisputed he was not and the Intervenors paid their money to Shipley personally, not to DSGI.[13]  The face of the SPAs confirm Shipley was not acting as DSGI's agent or as its Chairman but was acting as a "private individual."  Potter SPA at 2; MWIG SPA at 2; Weiland SPA at 2.[14]

Finally, Intervenors contend that DSGI waived its right to enforce the restrictions because DSGI knew of the transfers but failed to object or unwind them and allowed the Intervenors to attend shareholders meetings.  Intervenors' Oppo. 19.  The evidence about DSGI's knowledge of the purported transfers between Shipley and the Intervenors is thin and contested – Weiland Jr. testified that he "expressly reminded" Kowalski of one purported transfer during a conversation in 2006 and that Kowalski should have inferred from an email Weiland Jr. sent to him in 2008 that Shipley purportedly sold additional personal shares to the Intervenors.  Weiland Jr. Decl. ¶¶ 10, 13.  That ambiguous evidence hardly supports an argument of waiver, which requires an intentional relinquishment of a known right.  *United States v. King Features Ent., Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).  And just because DSGI allowed Intervenors to attend shareholders meetings was not an indication of the Intervenors' status as shareholders--Kowalski testified that it was a common practice at DSGI for people to bring family and friends to attend these meetings and he knew that the Intervenors are family members of Shipley.  Kowalski Dep. at 95:22-96:24.

---

[13] Weiland, Sr. Decl., ¶ 5 ("Dale told me that DSGI's board of directors was approving the sale of about 25,000 shares to family, close friends and other accredited investors.  Dale said that some of the investors could purchase shares directly from DSGI, but *he asked that I purchase my shares directly from him* so that he would make the money from the sale.") (emphasis added).

[14] For the same reasons, Intervenors' arguments that they acted reasonably in believing Shipley was acting on behalf of DSGI and was authorized as the Chairman of the Board to sell his personal shares to them is legally irrelevant regarding the claims of the United States.  In any event, whether Shipley as the Chairman of the Board was authorized to sign off on sales of DSGI stock or empowered to sell "additional" shares of DSGI stock is irrelevant to Shipley's efforts to sell his own personal, existing shares of stock to Intervenors.  Kowalski Dep. [Dkt. No. 307-5, Ex. 1] 49:9-19; *see also id*. at 53:4-20.

United States District Court
Northern District of California

In any event, Intervenors provide no authority for the proposition that DSGI was bound to do anything if and when it supposedly learned of the purported transfers.  It is undisputed that it was not until DSGI received the Levy that Intervenors asked DSGI to issue them stock certificates, and DSGI never issued the Intervenors share certificates for their purported transfers from Shipley's restricted shares.  Kowalski Dep. at 81:20-82:18; 126:23-127:2.

In sum, the restrictions requiring both an exemption from registration and an opinion of a counsel were not waived by DSGI or by Shipley acting as an agent of DSGI.[15]

### B.     Theories of Ownership

Despite Shipley's failure to comply with the restrictions – and the Intervenors' failures to ask DSGI to issue them stock certificates – Intervenors have three theories of why they should nonetheless be considered owners of the disputed stock.

First, Intervenors argue that because they signed the SPAs with Shipley to purchase the shares from him, they have beneficial ownership of the stock shares even though DSGI never issued them stock certificates.  *Id.*  But the beneficial interest cases Intervenors rely on rest on starkly different facts than presented here.  In each of the cases that Intervenors rely on, it was the company that purported to sell or transfer stock for the company's benefit.  Here, Shipley held existing, restricted stock shares and attempted to sell his personal shares to new holders without complying with the restrictions that were present in the SPA between Shipley and DSGI, present on the back of the stock certificates issued to Shipley from DSGI, and also included the subsequent SPAs Shipley entered with the Intervenors.  Only where it was the company who benefitted from the sales, and where it was the company who had not completed the final steps to

---

[15] Intervenors also assert their purported rights to 3,000 shares of DSGI stock that the Intervenors inherited from Eileen Potter (Brian Potter's and Michael Weiland, Sr.'s mother and Shipley's mother-in-law).  Intervenors' MSJ at 5-6.  Intervenors contend that Eileen Potter purportedly purchased 1,250 shares of DSGI restricted stock from Shipley on April 20, 2006, and an additional 6,250 shares from Shipley on August 10, 2010.  *Id.*  Intervenors assert that upon her death Eileen Potter's shares were distributed 20 percent each to Brian Potter, Michael Weiland Sr., and Helen Shipley, and the Intervenors seek to add their inherited shares to their claim.  Intervenors Reply 16.  These claims fail for the same reason – the restrictions on Shipley's stock certificate are effective and failure to comply with the restrictions makes their purported transfer from Shipley not effectuated.

1  issue certificates, have California courts found sufficient grounds to find the purchasers had

2  "beneficial interest" in the stock even though the companies failed to issue stock certificates.

3      For example, in *Lowe v. Copeland*, the court affirmed that the plaintiff was the owner of

4  stock where "[i]t was found that the agreed price had been paid, but that there had been no demand

5  [by the plaintiff] for the issuance of and no refusal to issue [by the company], a certificate therefor,

6  and that the defendants had been at all times ready and willing to issue the same to plaintiff." 125

7  Cal. App. 315, 325 (Cal. Ct. App. 1932). Intervenors argue the facts here are similar, because

8  while they had not asked DSGI to record their purchases and issue certificates, DSGI testified that

9  had it been asked, it would have done so. Intervenors' MSJ at 12.[16] While the *Lowe* court granted

10  the plaintiff a decree to declare his ownership of the stock, that was because plaintiff paid the

11  agreed price *directly to the company*, and the company should not have been able to retain the

12  benefit of the investment and deprive the plaintiff of his beneficial ownership. 125 Cal. App. at

13  321-22. That is obviously different than here, where the company was not involved in and

14  received no benefit from the purported transfer.

15      In *Commissioner of Internal Revenue v. Scatena*, in determining whether a taxpayer's

16  stock dividends were subject to tax, the court ruled that because the issuer of the dividends did

17  everything it could, besides transferring a certificate, to pass the title of the shares to the taxpayer,

18  the taxpayer had title to the shares at that time, even if she did not receive a certificate in that

19  taxable year. 85 F.2d 729, 732 (9th Cir. 1936). Not only does that case address a different

20  question (when did tax liability arise), but the transaction was between the issuer of the stock and

21  the taxpayer and the evidence was that the issuer corporation intended to transfer the shares to the

22  taxpayer. *Id.* ("Another factor which tended to establish the passage of title to the shares of stock

---

[16] Intervenors oversimplify DSGI's testimony. Kowalski testified that, for a transfer to be effective, the transferee has to "sign a transfer document confirming that the shares have certain restrictions of the transfer, and they comply firmly to the terms and conditions of the original shareholder agreement they signed. So the transferee has to make this commitment for us to allow for the transfer to take place." When asked "had you received [a request to transfer for the Intervenors by either the Intervenors or Shipley], the question is would you have any reason to deny Mr. Shipley's transfer of shares to [the Intervenors]?" Kowalski answered, "*As long as he filled [sic] the document process I described numerous times*, the answer is, no, I would not have prevented it." Kowalski Dep. 114:1-115:23 (emphasis added).

United States District Court
Northern District of California

is that the Bank of America N. A. declared on December 3, 1928, a cash dividend payable on January 2, 1929, to stockholders of record on December 8, 1928, which the respondent received early in 1929"). There is no evidence that DSGI had any intent to issue certificates to the Intervenors at any time.[17]

Intervenors next contend that they are "equitable owners" of the stock shares, entitled to priority over the United States based on the doctrine of equitable assignment. Intervenors' MSJ at 12-13. Under equitable assignment, title passes by contract so both parties must have the intent to transfer for there to be equitable rights in stock. *Day v. MCC Acquisition, LC*, 299 Va. 199 (2020).[18] As the United States notes, equitable assignment seems to provide a good claim by the Intervenors against Shipley but the doctrine cannot defeat the United States' interest in stock that is currently reflected in DSGI's ledger as belonging to Shipley absent evidence of an agreement between DSGI and the Intervenors. *See id.* at 210 ("As between an assignor and assignee, the validity and efficacy of an assignment in the stock context depends upon the validity and efficacy of the assignment instrument, not upon the physical possession of a properly endorsed stock certificate or the recordation of that assignment on the books of the corporation.").

Shipley was fully aware that he possessed restricted stock: the restrictions were in his SPA with DSGI (which he repeated in his SPAs with the Intervenors), and on the stock certificates themselves. Shipley knew how to comply with the restrictions, as shown by his conduct in transferring shares to his wife's IRA and Cohn. Arguably, Shipley's failure to comply with those restrictions with respect to the transactions with Intervenors – not providing an opinion of counsel that transfer would not jeopardize the unregistered nature of stock or demonstrating that an exemption to registration applied, and then not presenting the transfer to DSGI so DSGI could

---

[17] The other cases cited regarding beneficial interest are likewise unhelpful to Intervenors. *See Kaczmarek v. Comm'r*, 21 T.C.M. (CCH) 691 (T.C. 1962) (determining tax liability based on purported stock distribution agreement); *Doan v. Singh*, No. 1:13-CV-00531-LJO, 2013 WL 3166338, at *9–10 (E.D. Cal. June 20, 2013) ("Here, plaintiffs fail to state a claim for failure to issue share certificates because they fail to allege that they demanded issuance of the share certificates and that their demand was denied").

[18] *Id.* ("[t]he contract is executed, and the title passes, if such is the intention of the parties, even though the stock may remain in the name or in the possession of the seller . . . .")

1    approve and issue new certificates to him and the Intervenors – demonstrates his intent to *not*

2    transfer the stock shares.

3          Under their third ownership theory, Intervenors claim that they did not buy stock

4    certificates but a "chose in action" that "broadly includes any 'personal right not reduced into

5    possession, but recoverable by a suit at law.'" *Day*, 299 Va. 199 at 208; *see also Porter v. Gibson*,

6    25 Cal. 2d 506, 514 (1944) ("Since certificates of stock as choses in action are expressly excluded

7    from the terms of the Uniform Sales Act . . . [t]he rights of the parties therefore in this action must

8    be determined by the law applicable to sales of shares of stock independent of any provision of the

9    Uniform Sales Act."). Intervenors claim that legal titles passed to them when they entered the

10   SPAs with Shipley. Intervenors' MSJ at 4. But Shipley signed the SPAs as a "private individual,"

11   so no contract existed between the Intervenors and DSGI. Moreover, this argument fails because

12   the Intervenors' purported purchase was ineffective without compliance with the transfer

13   restrictions. United States' Oppo. to Intervenors' MSJ ("United States Oppo.") [Dkt. No. 313] 14.

14   DSGI's restrictions on the transfer of its shares, as explained, are of great importance to a closely

15   held company, and those processes were not followed by Shipley or the Intervenors despite their

16   clear knowledge of how to properly follow and effectuate a transfer.

17         For the foregoing reasons, the Intervenors have not demonstrated that their stock purchases

18   of Shipley's personal stocks were effectuated. The Intervenors have no grounds to oppose the

19   United States' levy on the DSGI stock held by Shipley as reflected in the DSGI's stock ledger.

20   Therefore, summary judgment on the Intervenors' wrongful levy claim is GRANTED to the

21   United States and against the Intervenors.

22   **III.    FORECLOSURE OF TAX LIENS**

23         In its affirmative motion for partial summary judgment, the United States moves to

24   foreclose its tax liens on the DSGI stock. The Intervenors and the Shipleys raise two arguments in

25   opposition. First, the Intervenors contend they are "purchasers" or "protected purchasers" under

26   federal law who have priority in ownership in the stock shares such that the United States cannot

27   foreclose the tax liens against the disputed DSGI stock. Second, the Intervenors and the Shipleys

28   argue that the United States misapplied funds received through the Receiver's actions so that some

United States District Court
Northern District of California

27

part of the liens to be foreclosed should have been fully extinguished.

### A.     Priority of Ownership

I.R.C. § 6321 states "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  I.R.C. § 6321.  I.R.C. § 6322 provides that a tax lien attaches to property owned by the taxpayer at the time the tax assessment is created and continues until the tax liability is resolved or becomes unenforceable due to lapse of time.  I.R.C. § 6322.  However, individuals with certain status have priority in rights over that of the United States.  These classes of individuals include "any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor."  I.R.C. § 6323(a).  Here, the IRS filed the lien on June 12, 2007.  The Intervenors contend that they have priority in rights against the United States because they purchased the stock from Shipley prior to the effective date of the United States' first lien.  Intervenors' MSJ at 19-20.

For the reasons discussed above, the Intervenors do not meet the statutory requirement of "purchasers."  I.R.C. § 6323 explains that a purchaser is "a person who, for adequate and full consideration in money or money's worth, acquires an interest . . . in property which is valid under local law against subsequent purchasers without actual notice."  I.R.C. § 6323(h)(6).  Given my conclusion that the Intervenors had actual notice of the transfer restrictions governing the DSGI stock, they cannot be purchasers under California law because of their failure to comply with the transfer restrictions.  *See* Cal. Com. Code § 8204 (providing restrictions on transfers or sale of stock effective only against those with knowledge).  The Intervenors knew they were attempting to purchase restricted stock and the applicable restrictions appeared in the Intervenors' SPAs.  Shipley and the Intervenors' failure to comply with those enforceable restrictions means the Intervenors are not "purchasers" under I.R.C. § 6323(h)(6).

Similarly, the Intervenors argue they are "protected purchasers" under California law with superior rights to the DSGI stock.  Cal. Com. Code § 8303(a).  A "protected purchaser" is a "purchaser of a certificated or uncertificated security . . . who does *all* of the following: (1) [g]ives value, (2) [d]oes not have notice of any adverse claim to the security, (3) [o]btains control of the

1   certificated or uncertificated security, (4) . . . acquires its interest in the security free of any

2   adverse claim." *Id.*

3       Intervenors are not "protected purchasers" entitled to priority because they fail to satisfy

4   (3)--they failed to obtain control of the security.  California Commercial Code § 8106 (a)-(b)

5   states:

6       (a) A purchaser has "control" of a certificated security in bearer form if the certificated
    security is delivered to the purchaser.

7       (b) A purchaser has "control" of a certificated security in registered form if the certificated
    security is delivered to the purchaser, and either of the following applies:

8         (1) The certificate is endorsed to the purchaser or in blank by an effective
    endorsement.

9         (2) The certificate is registered in the name of the purchaser, upon original issue or
    registration of transfer by the issuer.

10    Here, Intervenors did not ask DSGI for or receive from DSGI certificates representing the

11  transfer of shares from Shipley to them.  Neither Shipley nor the Intervenors sought or provided an

12  opinion of counsel or demonstrated to DSGI that they fell within an exemption, as required to

13  transfer the stock.  The Intervenors did not "obtain control" of the security to be considered

14  "protected purchasers."  As a result, Intervenors have no superpriority rights against the United

15  States over Shipley's stock shares.

16      **B.**    **Misapplication of Funds**

17      In their Reply briefs, Shipley and Intervenors contend that the United States is not entitled

18  to foreclose its tax liens on the DSGI stock because it failed to apply the money received into the

19  Receivership to satisfy the tax assessments in a chronological order based on the dates the tax

20  assessments were created.  Shipley's Reply to Oppo. MSJ ("Shipley Reply") [Dkt. No. 318] 4-5;

21  Intervenors' Reply in Support of MSJ ("Intervenors Reply") [Dkt. No. 319] 7-8.  They claim that,

22  but for the United States' misapplication, Shipley's tax assessment of the 2004 tax liability (the

23  only liability covered by the Notice of Federal Tax Lien recorded on June 12, 2007), would have

24  been paid in full.  *Id.*

25      Shipley and the Intervenors base their misapplication argument on Internal Revenue

26  Manual 5.11.5.5.  The language in the I.R.M. provides:

27      (1) Credit levy payments on the date they are received.  Apply the
    money *in the most advantageous way* to the government.  Generally,

28

United States District Court
Northern District of California

> apply it to the oldest assessment listed of the Notice of Levy first.  The taxpayer *cannot designate how to apply the money* because it is not a voluntary payment.

I.R.M. 5.11.5.5 (emphases added).  A taxpayer can direct the application of a *voluntary payment* to a specific tax liability, but the IRS has the authority to allocate *involuntary payment* to the benefit of the government.  *Tull v. United States*, 69 F.3d 394, 396-97 (9th Cir. 1995) (citing *In re Tech. Knockout Graphics, Inc.*, 833 F.2d 797, 799 (9th Cir. 1987)).  A payment is involuntary if it is "received by agents of the United States as a result of distraint or levy . . . in which the Government is seeking to collect its delinquent taxes or filed a claim therefor."  *Amos v. Comm'r*, 47 T.C. 65, 69 (1966).

This misapplication argument is irrelevant to the Intervenors' claim against the DSGI stock.  As explained above, Shipley's sale of stock to the Intervenors was never effectuated.  Therefore, whether the 2004 tax liability should have been extinguished by a proper application of payments in the Receivership, is irrelevant to them.  Intervenors simply have no rights – as to DSGI or the United States – regarding the DSGI stock and no standing to object to the United States' summary judgment to foreclose the tax liens on this ground.

Regarding Shipley, a misapplication of payments argument might be significant to him in some forum, but it is not clear how it impacts the IRS's motion to foreclose the liens on the DSGI stock.  For example, he does not argue that the value of the DSGI stock at issue exceeds his tax liability to the United States (or would exceed that liability if payments had been applied appropriately).  Moreover, Shipley does not support his argument that the United States was required to apply the money to the tax assessments in a chronological order based on the dates the assessments were created.  Shipley does not explain *why* the United States' application of payments from the Receivership to his tax liability across multiple assessments was not in the United States' best interests or was otherwise impermissible.  This is not a voluntary payments case.  The United States, therefore, has the right to allocate Shipley's involuntary payments *to the benefit of the government*, and a taxpayer does not have the power to choose how the involuntary payments should be assigned.  *Tull*, 69 F.3d, at 396-97.

Shipley fails to demonstrate that the government allocated the payment *not* to the benefit

United States District Court
Northern District of California

of the government; he only points to the disadvantage towards himself.  He argues that by allocating payments in this manner, "the United States is inflating the amount that is owed by having interest grow on all years instead of resolving certain tax periods."  Shipley Reply at 5.  It is unclear what impact doing so would have on the liens at issue, given the amount of Shipley's outstanding tax debt to the IRS, much less how that could possibly prevent foreclosure on the DSGI stock.  Moreover, while Shipley alleges that the United States is required to remove the "accrued interest caused by incorrectly applying payments" to years other than the 2004 assessment, he cites in support only I.R.C. § 6404(e), providing that the IRS may abate assessments of interest due to "any unreasonable error or delay in such payment [] attributable to an [IRS] officer or employee being erroneous or dilatory in performing a ministerial or managerial act[.]"  *Id*. at 5.  Applying payments received in the best interest of the United States government would appear to be neither a ministerial nor managerial act covered by that section.  In short, Shipley's argument – raised for the first time in reply – is not supported by persuasive authority that would apply given the facts of this case and to preclude the United States from foreclosing its liens against the DSGI stock.

In sum, Intervenors do not possess priority in rights against the United States, which has the authority to allocate involuntary payments to the government's benefit when there are multiple tax assessments.  Summary judgment on the foreclosure of Federal Tax Liens is GRANTED to the United States and against the Intervenors.

## IV.     BREACH OF CONTRACT

Finally, Intervenors move for summary judgment on their breach of contact claim asserted against both DSGI and Shipley for their respective failures to effectuate the stock transfer and for "specific performance" of the same.  Intervenors' MSJ at 22-24.

That motion is DENIED as to DSGI.  While Intervenors move on this claim in their opening brief, Intervenors' MSJ at 22-23, they appear to back away from it in their reply.  *See* Intervenors Reply 3 ("Mr. Kowalski's uncorroborated, self-serving and conclusory statements [about DSGI needing to approve transfers or sales of its shares] will not save the company from Intervenors' separate breach of contract and fraud claims against DSGI. But that is a matter for

another day.").

At base, Intervenors provide no evidence that any contract was entered into between any of the Intervenors *and DSGI*. The only agreements mentioned and relied on by Intervenors in this round of briefing have been the SPAs that the Intervenors entered into with Shipley "as an individual." They cannot contradict the clear and express language of those SPAs and do not point to any other provisions in their SPAs or other purported agreements that could constitute a contract between the Intervenors and DSGI. The Intervenors instead argue that DSGI should be considered to have "consented" to the SPAs between the Intervenors and Shipleys because of: (i) DSGI's "continuous acceptance of Shipley routinely bringing investors to DSGI"; (ii) "DSGI did not investigate Intervenors, but assumed they were accredited by virtue of their relationships to Shipley"; and (iii) "DSGI invited Intervenors to shareholder meetings that they attended." Intervenors' MSJ at 22. Intervenors point to no contractual provision between them and DSGI and provide no statutory or caselaw support for the proposition that simply because Shipley brought investors to DSGI (that even Intervenors admit was not the case with the contested shares at issue) and DSGI allowed family members of shareholders like Shipley and MWIG to attend shareholder meetings, that somehow the SPAs Shipley entered into as "an individual" are enforceable against DSGI.

Intervenors' motion for summary judgment on the breach of contract claim against DSGI is DENIED. They are not entitled to specific performance or any other form of relief against DSGI on their breach of contract claim.

The Intervenors also move for summary judgment on their breach of contract claim against Shipley and seek specific performance as a remedy, requiring Shipley to effectuate the transfer of the promised DSGI shares. Shipley fails to oppose or respond to the argument in his opposition or reply briefs. Therefore, summary judgment is GRANTED to the Intervenors on their claim for breach of contract against Shipley. The Intervenors, however, are not entitled to specific performance given my conclusion that all of the DSGI stock held in Shipley's name by DSGI is subject to the liens foreclosed on by the United States. If Intervenors believe they are entitled to any other form of relief against Shipley as a result of the breach claim, a separate briefing schedule

1  will be set.

2                                **CONCLUSION**

3          The United States' motion for partial summary judgment is GRANTED.  The Intervenors'

4  motion for summary judgment against the United States and DSGI is DENIED, but GRANTED

5  against Dale Shipley.

6          A further Case Management Conference is set in this case for October 4, 2022 at 2:00 p.m.

7  to address the schedule to resolve any claims left in this case and when the Receivership may be

8  closed.

9          **IT IS SO ORDERED.**

10  Dated: August 29, 2022

11

12

13  
William H. Orrick
United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28